UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,  :     12 Cr. 409 (PAE)

      -against-  :

JAMES PETERSON,  :

           Defendant  :

------------------------------------x

## DEFENDANT JAMES PETERSON'S POST HEARING MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO SUPPRESS

John F. Kaley, Esq.
217 Broadway, Suite 707
New York, New York 10007
(212) 619-3730

Anthony Cecutti, Esq.
100 Lafayette Street, Suite 401
New York, New York 10013
(917) 741-1837

*Attorneys for James Peterson*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,        :       12 Cr. 409 (PAE)

        -against-                    :

JAMES PETERSON,                  :

                Defendant        :

------------------------------------x

## STATEMENT OF FACTS

On February 20, 2012, a male called 911 and reported to a 911 operator that he thought that Mr. Peterson possessed a gun. The 911 operator in turn relayed some of the information provided by the male caller to a NYPD dispatch officer. The NYPD dispatch officer informed police officers at the 48th precinct of a "male black with a gun, wearing all black" and an approximate location – 739 East 182nd Street, Clinton and Prospect Avenues.[1] After receiving this information from the NYPD dispatch officer, and without further investigation or corroboration of the information, police officers went to the vicinity of the location provided by the dispatcher, observed Mr. Peterson walking away from the street address given in the dispatch, stopped and frisked Mr. Peterson, found a gun and arrested Mr. Peterson. It is not disputed that at the time of his seizure, Mr. Peterson was walking along a sidewalk. He was not acting in a

---

[1] In reviewing the "radio run," the information pertaining to the location provided by the NYPD dispatcher also included an address and apartment number. However, at the suppression hearing, neither police officer testified that they heard any apartment, and, therefore, they were unaware of both an address and an apartment number. Both officers testified that the location information given by the NYPD dispatcher consisted solely of an intersection - 182nd Street and Clinton Avenue. Consequently, regarding location, what the officers knew at the time of the incident, was nothing more than an intersection.

suspicious manner or committing any observable offense or otherwise engaging in criminality and the Government concedes that it is not relying on any street observations of Mr. Peterson by the officers.

The Government contends that the information provided by the NYPD dispatch officer to the officers at the scene provided the reasonable suspicion necessary for the officers to lawfully stop and frisk Mr. Peterson, even though the officers did not hear certain statements of the dispatcher and had no recollection of having heard other statements at the time in question. We disagree that the information known by the officers on the street provided reasonable suspicion to stop and frisk Mr. Peterson.

## ARGUMENT

## THE FIREARM SHOULD BE SUPPRESSED

I. THE FACTS KNOWN TO THE OFFICERS DID NOT PROVIDE REASONABLE SUSPICION

The measure of whether or not officers had reasonable suspicion to support a stop and frisk is determined by the information known by the officers at the time. *Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1373, 1375 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search"). Here, the information known by the officers was insufficient.[2] According to Officer Marte, he received a "call" from

---

[2] A police officer may conduct a *Terry* stop if at the time the officer makes the stop, he has sufficient information providing "reasonable suspicion" to believe that criminal activity has occurred or is about to occur. *See United States v. Lopez*, 321 F. App's 65, 66-67 (2d Cir. 2009); *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). In evaluating whether there is reasonable suspicion, a court must assess whether there was "a 'particularized and objective basis' for suspicion of legal wrongdoing under the 'totality of circumstances.'" *United States v. Simmons*, 560 F.3d 98, 103 (2d Cir. 2009). Reasonable suspicion is dependent upon the content of the information known by police at the time of a stop and its degree of reliability. Both factors,

the dispatch officer of a "male with a gun, wearing all black . . . male black." *See* August 28, 2012 Hearing Transcript ("Tr.") at 11, 18-19, 20. Officer O'Connor testified that the dispatch officer said that "there was a dispute with a firearm" (Tr. 33, 37) and that the potential suspect was a "male black wearing all black." Tr. 33, 37. The dispatch officer gave the approximate location of the incident to the officers - 182nd Street and Clinton Avenue. Tr. 12, 33, 37. Aside from the above information, Officers Marte and O'Connor either did not hear any other information provided by the dispatch officer or did not recall hearing any other information. Tr. 15, 18, 20, 35-36. In addition, neither heard the 911 call placed by the male caller or any calls between the caller and anyone from the NYPD. Tr. 15. Based on their hearing testimony, the only information the officers had was a location, a description of a person, the general awareness of a dispute with a gun and the fact of a phone call to the NYPD. The officers lacked any knowledge as to the identity of the caller and had no knowledge as to whether the caller provided a name, telephone number, address or other personal identifying information.

Based on testimony from Officers Marte and O'Connor and the information known to the officers, the caller plainly was "anonymous" to the patrol officers.

In *Florida v. J.L.*, 529 U.S. 266, 268 (2000), the Supreme Court ruled that an anonymous caller's information that a person was carrying a gun at a certain location could not, without more, provide reasonable suspicion to stop and frisk that person. In *J.L.*, an anonymous caller reported to police that a "young black man" standing at a particular bus stop, wearing a plaid shirt, had a gun. *Id.* Police responded to the bus stop and saw three black males, one of whom

---

quantity and quality, are considered in the totality of the circumstances. *See Alabama v. White,* 496 U.S. 325, 330, 110 S. Ct. 2412 (1990).

-3-

was wearing a plaid shirt. One of the officers frisked this person and found a gun on his person. *Id.*

The Supreme Court found that police did not have reasonable suspicion for this stop and frisk: the officers had not personally observed anything suspicious and they did not have an adequate basis to conclude that the anonymous report of a gun was reliable. *Id.* at 270-71. The Court noted that an accurate description of a person's visible attributes is not suitable corroboration of criminal activity. *Id.* at 271-72. An accurate description of a suspect's readily observable location and appearance is reliable in a limited sense, i.e., only in that it helps the police correctly identify the person accused. Reasonable suspicion, however, requires that an accusation contain sufficient indicia of reliability in its assertion of illegality, not just in its tendency to identify a determinate person. *Id.* at 272. This case, based on what was known to the officers, is governed by *J.L.*.

Under *J.L.*, an analysis of what was known to the officers Marte and O'Connor requires that the gun be suppressed. In both cases, what was known to the officers was similar – an accusation involving possession of a gun, a physical description and a general location. Such information possessed by officers Marte and O'Connor was not sufficiently reliable *on the facts known to the officers* to justify the stop and frisk. *See also United States v. Colon*, 250 F.3d 130, 132 (2d Cir. 2001) (a 911 call by a female caller who had been assaulted by an individual with a gun in a club prompted a police dispatcher to request that officers respond to a particular location; held information known to arresting officers insufficient); *United States v. Jackson*, 2011 WL 1431983*1, (S.D.N.Y. Apr. 12, 2011) (unknown female called 911 to report a "Hispanic, light-skinned male" who was "wearing a red hat, a white t-shirt, and blue jeans,

and . . . carrying a black book bag "in possession of a gun" near the intersection of East 180th Street and Southern Boulevard in the Bronx" and where police had the caller's telephone number; held information known to officers not enough to establish reasonable suspicion); *United States v. Muhammed*, 463 F.3d 115 (2d Cir. 2006) (a 911 call reporting "a black male dressed in white on a bike [with] a gun in his hand on Stanislaus headed toward Fillmore" found insufficient *by itself* to justify the stop, but sufficient in conjunction with defendant's evasive conduct and attempt to flee and officers' observations of same); *United States v. Riley*, 2006 U.S. Dist. Lexis 65800 (W.D.N.Y. September 13, 2006) (911 call reporting black male with a gun, all dressed in black at an intersection lacked sufficient indicia of reliability to justify a stop and frisk).[3]

While in certain cases, reasonable suspicion to justify a *Terry* stop may be based upon information provided by an identifiable private citizen or known informant, rather than an anonymous caller, the information must be sufficiently reliable. *Adams v. Williams,* 407 U.S. 143, 147 (1972); *U.S. v. Elmore,* 482 F.3d 172, 179 (2nd Cir. 2007). While the assessment of reliability is to be made based upon the totality of the circumstances, "the informant's 'basis of knowledge' and 'veracity' (*i.e.*, how he knows and why we should believe him) remain highly relevant to a determination of . . . reasonable suspicion." *Elmore,* 482 F.3d, 172, 179 (2007) (citing *Alabama v. White,* 496 U.S. at 328-29). The Second Circuit has explained that the "basis of knowledge" inquiry examines "the quality of [the informant's] sources of knowledge of the

---

[3] This case also is different from the facts presented in *United States v. Freeman*, 2011 WL 5419739 (S.D.N.Y. November 8, 2011), which denied suppression because in addition to the anonymous caller, the officers had actually heard the information from the dispatcher, and along with the defendants "aggressive manner" and other factors, including the officer's own on-the-scene observations, provided sufficient indicia of reliability.

information." *United States v. Wagner,* 989 F.2d 69, 73 (2d Cir. 1993). In other words, the Court must assess whether the informant's allegations are based on reliable sources, "such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo." *Id.* Here, the officers had no information on which to make any such assessment.

Informant information that, standing alone, does not adequately demonstrate the informant's veracity and basis of knowledge may still amount to reasonable suspicion if it is sufficiently corroborated by law enforcement investigation. *See Elmore,* 482 F.3d, 172, 179 (citing *Draper v. United States,* 358 U.S. 307 (1959)). The problem here for the Government is that the officers did not hear the information, and no investigation occurred here. As to the balance between reliability and corroboration, the Second Circuit has noted:

> [I]t is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, as in [*Adams v.*] *Williams*, no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous, as in [*Alabama v.*] *White*, a significant amount of corroboration will be required.

*Id.* at 181.

Here, based on the information known to the officers, there was no indication of any reliability on the part of the caller and there was no corroboration by on street observations. In the instant matter, there was no information known to the officers from which they could determine the reliability of the caller's information or the caller's basis for his claimed knowledge of criminality. Based on the officers' testimony, only very limited information was known to them regarding a firearm. In addition, wholly absent from their testimony was knowledge on

their part of any facts demonstrating the caller's basis of his knowledge that the suspect possessed a gun or any other information supporting the purported reliability of the caller.

Furthermore, the information provided by the NYPD dispatch officer and what was known to the officers was lacking in any predictive information, which under certain circumstances - - not present here - - might otherwise demonstrate an indicia of reliability in the part of an anonymous caller. *See Alabama v. White*, 496 U. S. 325, 330, 110 S. Ct. 2412 (1990); *see also United States v. Houston*, 2009 WL 2876671 (E.D.N.Y. September 8, 2009) (predictive information and other factors supported reliability of anonymous caller). In addition, here also, the officers, despite their knowledge of a "dispute with a firearm," were not responding to an "ongoing emergency" or violent crime that was actually in progress. *See United States v. Simmons*, 560 F.3d 98, 107-08 (2d Cir. 2009) (upholding validity of stop and frisk in a "close case" where the 911 call reported "ongoing emergency," and where there were other additional factors in that case that supported the stop, i.e., the defendant walked towards the officers with his hands in his pockets, did not comply with the officers' first order to stop and ignored other requests to remove his hands from his pockets). Here, by contrast, the officers arrived on the scene. Mr. Peterson was alone. And there were no observations of any suspicious behavior or flight. There was no crime in progress. Mr. Peterson responded to the order to stop and did so. Unlike the responding officers in *Freeman*, the responding officers here did not ask Mr. Peterson any questions or conduct any independent investigation before they physically grabbed him. They could have engaged in additional observations of Mr. Peterson, attempted to speak with the caller or engage in reasonable inquiries with Mr. Peterson, but they did not. Consequently, the

could not reasonably conclude that this call and the very limited information known to them provided sufficient basis for a *Terry* stop.

Aside from the limited information from the NYPD dispatch officer which they heard and remembered hearing, the officers had no reason to suspect Mr. Peterson of any criminal activity.[4] Although the description given by the male caller concerning Mr. Peterson's appearance and location seemed to be accurate, it was of minimal value – it helped to identify the person the male caller sought to accuse. Such a description, however, does not show the caller's basis for his knowledge that Mr. Peterson possessed a gun. The reasonable suspicion here that is in contention requires that information be reliable in its assertion of criminality, not just in its ability to identify an individual, and same must be known to the officers. Here, the arresting officers, based on their testimony, had no such information. For these reasons, the firearm must be suppressed.

## 2. THERE IS NO BASIS TO INFER THAT THE OFFICERS KNEW MORE THAN THEY SAID THEY KNEW

In the initial part of the dispatch from the dispatcher to the patrol officers, the dispatcher states as follows:

> UI[5]... with a firearm. 739 East 182, 739 East 182 Clinton and Prospect. Male caller states male's in front of the location with a gun on him. He didn't visually see the gun, but the – the person said he had one. Male black, du rag, black coat, wearing all black. The complainant's in apartment **REDACTED**

---

[4] The absence by the officers of observable indicia of criminality on the part of Mr. Peterson challenges the reliability of the caller and is probative as to whether the officers had reasonable suspicion.

[5] At the hearing, the government indicated its view that the "UI" - - (unintelligible) that began both parties' transcripts was actually the word "Dispute." We leave it to the Court to determine what was said and what was intelligible or unintelligible.

-8-

Recording of the Dispatch Call, Exhibit "1A."

At the hearing, after the Government had elicited from the officers what they heard, the Court inquired of the defense counsel whether there was any basis to infer that the officers heard the additional information contained in the paragraph, specifically, the caller's address and apartment number, and the information that, while the caller had not seen a gun, the suspect had told the caller that he had a gun (Tr. 53). We responded then in the negative and adhere to the view that it would be improper to conclude that the officers affirmatively knew this additional information at the time of the incident based on their testimony.

On direct examination, both officers testified to the full substance to what they heard. On cross examination, the officers testified that they did not recall hearing any other information provided in the "radio run." Officers Marte and O'Connor were emphatic in what they heard and in what they remembered hearing and not hearing. Aside from the general accusation, "dispute with a firearm," they recalled only the intersection (182nd Street and Clinton Avenue) and the physical description of the suspect. Neither heard or remembered hearing the caller's basis of his knowledge that the suspect possessed a gun, i.e., that the called did not see a gun but that the suspect told the caller that he had a gun.

Further, given the circumstances, it is not surprising that the officers did not know and hear this additional information. While it appears that the NYPD dispatch officer communicated these additional facts, they were simply not heard and not known to the officers and there is no basis to reach a different conclusion. Indeed, to infer that the officers must have heard the entire excerpt, is to fictionalize the officers' account of what happened and what they heard. They were driving quickly to the scene with their lights and sirens on and focused on the incident at hand.

They more than likely did not hear more then they testified to, and that conclusion is more likely than imagining what they might have heard. On this record, the Government cannot meet its burden of proving that reasonable suspicion existed. *See United States v. Williams*, 2011 WL 5843475 *3 (S.D.N.Y. 2011).

In this case, the Government is bound by what the officers said they heard and by what they testified they remembered hearing. Information known to the dispatcher but not known to the officers on patrol simply is not and cannot be imputed to the patrol officers. *United States v. Colon*, 250 F. 3d at 138.[6] If the rule is that only information that is known to the officers may be considered, *see J.L.*, then the Court in this case has no basis to conclude that more was known.[7]

Nor will exclusion of the firearm in this case, on the facts here, stifle effective law enforcement action. The problem can be avoided by having better equipment or by requiring better training of 911 operators and dispatchers and better communication between them and

---

[6] Based on the Government's representations made at the hearing, we accept the Government's assertions that the dispatcher is not a law enforcement personnel such that the holding in *Colon* applies both to the 911 operator and to the dispatcher.

[7] Nor is there any evidentiary basis for the Court to select what portions of the "radio run" were heard by and known to the officers. To the extent the full first portion could be construed more favorably to the officers if they had heard it, other parts which the officers say they did not hear or did not remember hearing are more favorable to the defense and undercut the reliability of the caller. Thus, the dispatcher's further statement "10-4 . . . UI . . . Checking the call . . . UI . . . to see if he's still in front, stand by one" suggests that the dispatcher wanted to obtain further information as to the reliability of the caller and/or the facts before the officers on patrol took action. He tells the officers to "stand by." In our view, this undercuts the caller's reliability. So too, the further portion: "Alright 10-4. Hey -Adam and UI - be - be advised that uh, I spoke to the complainant - he says he never saw a gun. Now he's saying that he, the perp, never pulled out a gun, he says the perp may have a gun," likewise undercuts any reliability on the part of the caller. Yet, here also, the officers did not hear these portions and have no recollection of hearing them. On the record here, there simply is no justifiable basis for the Court to go beyond what the officers testified they knew and remembered hearing.

field officers, or by having the officers conduct some minimal on-the-street investigation and be ready to make their own trained observations and to take action if the suspect's conduct gave them further reason. As noted in *Colon*, "[t]his course would serve the interest of public protection without running afoul of the Constitution." 250 F. 3d at 138.[8]

### 3. THE FACT THAT THE DISPATCHER HAD THE COMPLAINANT'S APARTMENT NUMBER DOES NOT MAKE THE COMPLAINT'S INFORMATION RELIABLE

At the hearing, the Court inquired as to "why giving the apartment number, if I find it was given, doesn't supply the necessary accountability." (Tr. 85).

Our response is threefold. First, as noted above, there is nothing in the record demonstrating that the officers on patrol heard or knew of the complainant's address. Second, there is nothing in the record known to the officers demonstrating that the caller had provided the address. At best, the dispatcher gave the officers the complainant's address without any indication whether it was provided by the caller. For all the patrol officers knew, on this record, the dispatcher could have determined the caller's phone number from a "caller i.d." function on the dispatcher's phone and then determined the address from a "Coles" directory or from other electronic sources and not from the caller. *See United States v. Jackson*, 2011 WL 1431983 at *1 ("the caller's telephone number was automatically recorded by the 911 call center"). While

---

[8] We also are not unmindful of the caution expressed by Justices Brennan and Marshall in their dissent in *Leon*:

> "the majority ignores the fundamental constitutional importance of what is at stake here . . . . that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptation of expediency into forsaking our commitment to protecting individual liberty and privacy."

468 U.S. 929, 104 S. Ct. 3430.

providing an address may constitute some indicia of reliability and along with other factors may demonstrate accountability, here, there was no evidence known by the patrol officers that the address has been provided by the caller. As such, the fact that the caller's address was known to the dispatcher (and unbeknownst to the patrol officers had been given by the caller to the 911 operator) was not indicative to the officers on patrol of any recognition of accountability on the part of the caller. Third, even if the officers knew of the address and apartment number, and that it had been provided by the caller, the information contained in the initial paragraph from the dispatcher should still be evaluated in the "anonymous caller" context as it does not increase the caller's reliability or establish the caller's accountability.

Providing an apartment number does not necessarily mean that the caller is present inside the apartment or that the caller is the only one present inside the apartment. Additionally, in assessing the caller's accountability it is necessary to discern what the caller is holding himself accountable for, if it is presumed he provided the apartment location. Based on the vagueness of his complaint and quick "recantation" regarding the statement that Mr. Peterson said he had a gun, the caller was not holding himself accountable for much. The most that could be said is that the caller said he thought that Mr. Peterson had a gun. The vagueness of this information does not provide the accountability required to establish any indicia of reliability.[9]

---

[9] We recognize that in making this argument we move beyond the first paragraph of the dispatch. But if the Court is going to ignore the officers' testimony as to what they knew and heard, the Court might just as well ignore the testimony and conclude that the officers heard the other portions as well. These other portions undercut accountability because of the vagueness and inconsistency of the caller's several statements. Of course, as we argued above, there is no basis to conclude that the officers knew more then they said they knew.

In sum, while the providing of an address by a caller may, in certain circumstances, contribute to a finding of accountability and reliability, such a conclusion is not warranted in this case and on this record.

## 4. RELIANCE ON ERRANT CIVILIAN INFORMATION DOES NOT SAVE THE DAY FOR THE GOVERNMENT

During the oral argument after the hearing, the Court invited further briefing on the issue of the effect of "errant" civilian information on the officers' determination of reasonable suspicion. Of course, the Court need only reach this issue if it concludes, which we submit it should not, that the patrol officers knew of the caller's information to the effect that the caller "didn't visually see the gun, but the - the person said he had one," which statement was quickly recanted by the caller later in his conversation with the dispatcher. ("No, he never told me, he never told me he had a gun"). The issue then is whether "false" or "errant" caller information may, nonetheless, under the "good faith" exception, provide reasonable suspicion to support a stop and frisk. Our answer is not on the facts of this case. That is because the patrol officers' mistaken belief that the caller said that Mr. Peterson said he had a gun without being aware of or hearing the recantation of that statement was the product of their own unreliable methods of interacting with the dispatcher and tracking and corroborating the information provided by the caller. That is particularly so here, where the dispatcher had told the officers to "stand by" while the dispatcher sought further contact with the caller, and if the officers did not hear this caution, as they so testified, they should have interacted further with the dispatcher and conducted further on-the-street investigation, as in *Freeman*, before stopping and frisking Mr. Peterson.

The "good faith" exception set forth in *United States v. Leon*, 468 U.S. 897, 919-22, 104 S. Ct. 3405 (1984) and extended in *Arizona v. Evans*, 514 U.S. 1, 14-16, 115 S. Ct. 1185 (1995) and more recently in *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695 (2009) does not save what happened here. In those cases, the conduct at issue did not occur within the police department. *Leon* involved the judicial issuance of a warrant on what was later to be determined to be less than probable cause. *Evans* and *Herring* involved arrests based on judicial warrants that the arresting officers (and police departments) because of clerical errors outside of the police departments, had not been recorded to have been withdrawn. Here, however, it was the police that bear at least some responsibility for the situation. Granted, it was the caller that provided the "errant" and later recanted information in the first instance, but it was the police that failed to communicate effectively with the dispatcher, and it was the police that failed to take the steps necessary to evaluate the information and to determine the reliability of both the caller and the caller's information before conducting the stop and frisk. It is the need to deter this type of police deficiency which necessitates suppression, *see Evans* and *Herring; see also United States v. Santa*, 180 F. 3d 20, 27-30 (2d Cir. 1999), and the threat of exclusion of evidence can be expected to deter this type of police inadequacy. *Id.* at 30. In *Santa*, officers arrested the defendant in reliance on a statewide computer database record, which, due to a clerical error, showed the existence of an outstanding arrest warrant for he defendant. Because the source of the error was a clerk in a village court in upstate New York and not the police department, the court declined to apply the exclusionary rule. In so doing, the Court focused on the source of the error and the identity of the individuals responsible for the error. In *Santa*, it was not the police department.

-14-

Here, the patrol officers' conduct and the lack of follow-up investigation - - particularly given the limited information which the officers said they were aware of - - short of a stop and frisk, was not objectively reasonable. As such, the error in this case implicating the need to deter Fourth Amendment violations was in significant part the "fault" of the police. Application of the exclusionary rule in circumstances such as those present here will cause the officers to undertake further investigation and will deter the police from conducting stop and frisks on what amounts to insufficient and recanted information.[10] *United States v. Parker*, 1999 U.S. Dist. Lexis 16935, cited in our letter of August 27, 2012, supports this analysis.

It has been said that while courts must sometimes afford some latitude for honest mistakes when officers are making arrests and executing search warrants, no such latitude is afforded, where, as here, there was no emergency and the officers had opportunity to conduct and to take further necessary investigatory steps. *See United States v. Voustianiouk*, 685 F. 3d 206, 216 (2nd Cir. 2012). While the facts of *Voustianiouk* are quite different from those present

---

[10] Neither *United States v. Jenkins*, 452 F. 3d 207 (2d Cir.2006) nor *United States v. Stewart*, 551 F. 3d 187 (2d Cir. 2009), relied upon by the Government control on the facts of this case. Both cases involved automobile searches, where the vehicles were traveling on public roadways and where the expectation of privacy is considerably less than that of one's person. Further, in *Jenkins*, there was an independent basis for the search of the vehicle and subsequent arrests unrelated to the reason why the vehicle was stopped in the first instance, and in *Stewart*, the Court determined that the action of the police in stopping the vehicle was objectively reasonable based on information arising from the officer's own personal observations. By contrast, in this case, the officers' suspicions were not based on their own direct observations, *see United States v. Bristol*, 819 F. Supp. 2d 135, 142, fn. 12 (E.D.N.Y. 2011), and the officers made no personal observations to support a stop and frisk such that a mistake in their own observations, made in god faith, might permit the seizure to stand. Here, their error lay not in a good faith mistaken personal observation but in the failure to conduct adequate discourse with the dispatcher and in the failure to conduct an adequate investigation before conducting a stop and frisk.

here,[11] the logic fully supports suppression here, i.e., a need to deter certain police conduct "to compel respect for the constitutional guaranty." *Id.* at 217, citing *Davis v. United States,* ___ U.S. ___, 131 S. Ct. 2419, 2423 (2011). In this case, the goal of deterring police actions that violate the Fourth Amendment outweigh the cost to the law enforcement objectives.[12]

## CONCLUSION

What was known to the officers, as established by their testimony, must control the Fourth Amendment analysis. The allegation made by a caller of a male, in possession of a gun, with a certain description in a general location, without more, was insufficient to establish reasonable suspicion in this case.

For the reasons set forth above, the Court should suppress the firearm seized from Mr. Peterson.

---

[11] In *Voustianiouk* officers searched an apartment other then the one for which they had a search warrant. The Court determined that the "good faith" exception did not apply.

[12] Moreover, an Officer's good faith alone, even if it existed, does not make his suspicion reasonable. *See United States v. Williams,* 2011 WL 5843475 *5 (S.D.N.Y. Nov. 21, 2011). Nor do we submit was there a reasonable mistake in this case. The officers' conduct in not better communicating with the dispatcher and in not conducting any on-the-street observations and further investigation was not reasonable. *See United States v. Moore,* 2011 WL 6325973 *8 fn. 6 ("the officers have not articulated sufficient facts to demonstrate that they reasonably believed the cab was in violation of the traffic laws. In other words, there is no 'reasonable mistake' in this case.")

Dated: New York, New York
      September 10, 2012

                              Respectfully submitted,

                              _____
                              John F. Kaley, Esq. (JK: 3598)
                              Doar Rieck Kaley & Mack
                              217 Broadway, Suite 707
                              New York, New York 10007
                              (212) 619-3730
                              *Attorney for Defendant James Peterson*

                              _____
                              Anthony Cecutti, Esq. (AC: 5867)
                              100 Lafayette Street, Suite 401
                              New York, New York 10013
                              (917) 741-1837
                              *Associate Counsel for Defendant James Peterson*