UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA                      :

    - v. -                                              :       12 Cr. 409 (PAE)

JAMES PETERSON,                                    :

        Defendant.                              :

                                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR PRE-TRIAL RELIEF**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


ANDREA L. SURRATT
DAMIAN WILLIAMS
Assistant United States Attorneys
    - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in opposition to the motion of defendant James Peterson (the "defendant") and in response to the Court's August 28, 2012 invitation to the parties to submit post-hearing briefing.

On August 28, 2012, the Court held an evidentiary hearing (the "Hearing") on the defendant's motion to suppress the handgun that was found inside the waistband of his pants on February 20, 2012.  The testimony of the Government's two witnesses at the Hearing established that the officers had reasonable suspicion, based on a 911 call, to stop and frisk the defendant. For the reasons set forth below, the defendant's motion to suppress the gun should therefore be denied.

## EVIDENCE AT THE HEARING

At the hearing, the Government called two witnesses: New York City Police Department ("NYPD") Officers Ariel Marte and Michael O'Connor.  The Government also introduced two exhibits: a redacted copy of the 911 call placed on February 20, 2012 (Govt. Exh. 1) and a redacted copy of the radio run resulting from that 911 call (Govt. Exh. 2).

## FACTS

**A.      The 911 Call and Radio Run**

On February 20, 2012, an individual (the "911 Caller") who provided his name, address, including an apartment number, and telephone number, called 911 to report "a guy in front of the building with a gun."  (Govt. 911 Tr. 1).[1]  Although the caller did not see a gun, he

---

[1] "Govt. 911 Tr." refers to the redacted transcript of the 911 call that the Government provided to the Court and defense counsel.  "Govt. RR Tr." refers to the redacted transcript of the radio run that the Government provided to the Court and defense counsel.  "Tr." refers to the transcript of the August 28, 2012 hearing.

reported that the person with the gun – later determined to be the defendant – said "he was coming back with a gun." (Id. at 2).

As a result of this 911 call, two New York City Police Department officers were dispatched to the 911 Caller's location via a radio run, which is information conveyed to the officers over their police radio. (Tr. 12, 33). The radio dispatcher (the "Dispatcher") first stated, in a transmission that took just over 20 seconds:

> Dispute[2] with a firearm. 739 East 182, 739 East 182 Clinton and Prospect. Male caller states male's in front of the location with a gun on him. He didn't visually see the gun, but the person said he had one. Male black, du rag, black coat, wearing all black. The complaintant's in apartment [redacted].

(Govt. RR. Tr. 1). At the August 28, 2012 hearing, Officers Marte and O'Connor – the two NYPD officers who initially responded to this radio run – testified about which parts of this transmission they remembered hearing on the night of the defendant's arrest. Neither had heard the recording since February 20, 2012. (Tr. 30, 43). Officer Marte, who testified first, testified on cross-examination that the only part of the transmission that he heard "was a male with a gun at that location fitting the description, all black with a do-rag." (Tr. 22). He testified that that he did not hear the part of the transmission that relayed "the caller didn't visually see any gun." (Tr. 19). Officer O'Connor, who testified second, explained, in response to the question whether he heard "every part of" it responded that he "heard most of it, yes." (Tr. 37). Specifically, Officer O'Connor testified that he remembered the "dispute with a firearm" at the location, but did not remember hearing that the "male caller had said that the person was in front of the location with

_____

[2] Both the Government's and the defendant's transcripts show the word "dispute" as unintelligible on the recording. Both officers, however, testified that, when they heard the recording in Court, they heard the Dispatcher relay information about a "dispute" with a firearm. (Tr. 18, 37). Moreover, the Government submits that, upon listening to the recording, the Dispatcher clearly says the word "dispute."

a gun on him." (Tr. 37-38). Officer O'Connor remembered the Dispatcher giving a description

of the defendant as a "male black wearing all black." (Tr. 37). Officer O'Connor did not recall

hearing the part of the transmission where the Dispatcher relayed that the 911 Caller did not

visually see the gun. ( Tr. 38). Neither Officer Marte nor Officer O'Connor were asked

specifically whether they heard the portion of the transmission where the Dispatcher relayed that

the 911 Caller stated that he was located in a certain apartment number at 739 East 182nd Street.

      Next, the Dispatcher stated that he was "[c]hecking the call . . . to see if he's still

in front, stand by . . ." (Govt. RR. Tr. 1). Thereafter, audible on the radio run is an exchange

between the 911 Caller and the Dispatcher:

| | |
|---|---|
| Caller: | Hello? |
| Dispatch: | Yeah, New York City Police Department. Did you call police sir? |
| Caller: | Yes I did. |
| Dispatch: | Is the guy still in front of the building now? Can you see h – |
| Caller: | I hope so… UI… my baby mama talking about he left, and uh, I see blue and white I'm a – |
| Dispatch: | Hold on, hold on. Can you look out the window and see if you still see him? |
| Caller: | Uh… no I can't see the door. |
| Dispatch: | All right, well who actually saw him? You did or your – or your – |
| Caller: | I did! I did. |
| Dispatch: | So what happened, he told you he got a gun, he never pulled it out – |
| Caller: | No, he never told me, he never told me he had a gun. |
| Dispatch: | Alright so – |
| Caller: | They pulling him over now, they pulling him over now. |
| Dispatch: | But why did you say he had a gun? |
| Caller: | They pulling him over now. |
| Dispatch: | Alright, I'm the dispatcher, I'm talking to them. Why did you say he had a gun then? |
| Caller: | Because he – we got into an altercation, and now he came back. And – I'm a little worried. I said, he mighta got a gun, I didn't say like he had a gun. I didn't – |
| Dispatch: | Alright, you want to go talk to the police go stay downstairs. |

3

(Govt. RR. Tr. 2).  This portion of the radio run, which recorded a conversation between the Dispatcher and 911 Caller, was played for Officers Marte and O'Connor, who both stated that they did not hear it on February 20, 2012. (Tr. 15, 36).

After the Dispatcher made contact with the 911 Caller, the Dispatcher relayed over the radio: "be advised that uh, I just spoke to the complainant – he says he never saw a gun. Now he's saying that the, the perp never pulled out a gun, he says the perp may have a gun." (Govt. RR. Tr. 2-3).  Officer Marte testified that he did not remember hearing any of this portion of the dispatch.  (Tr. 25).  Officer O'Connor also testified that he did not remember hearing this transmission.  (Tr. 40).

## B.    The Officers Respond

On the night of the 911 call recounted above, Officers Marte and O'Connor were on patrol in the Bronx.  (Tr. 9, 32).  Officer Marte has been an NYPD officer for six years and has made 139 arrests.  (Tr. 9).  Officer O'Connor has been an NYPD officer for five years and has made over 100 arrests.  (Tr. 31).  Officer Marte testified that, on any given day, he might respond to anywhere from 10 to 70 radio runs.  (Tr. 9).  Officer O'Connor stated that a typical day for him might include 10 to 20 radio runs.  (Tr. 32).

Upon receiving the radio dispatch relaying a "dispute with a firearm" recounted above, Marte and O'Connor, using the lights and sirens on their patrol car, responded to the intersection of Clinton and Prospect Streets in the Bronx.  (Tr. 12, 33).  Officer Marte testified that it took around 20 seconds to travel to the dispatch location (Tr. 12) and Officer O'Connor, who was driving, testified that it took around one minute (Tr. 34).  Once the officers arrived, they saw the defendant, wearing a "black top, black pants, black hat, black sneakers."  (Tr. 13,

34).  The officers did not see anyone else in the area, and the defendant's appearance matched the Dispatcher's description perfectly.  (Tr. 13, 35).  Officer Marte approached the defendant and placed his hand on the small of the defendant's back.  (Tr. 14).  In so doing, Officer Marte felt a hard, metal object.  When he lifted the defendant's shirt, he saw a firearm tucked into the defendant's pants.  (Tr. 14-15).

## C.    Dispatchers Are Civilians

At the August 28, 2012 hearing, the Court asked the Government to submit a declaration supporting its assertion that NYPD dispatchers are civilians and are not trained to make reasonable suspicion determinations.  Accordingly, attached as Exhibit A is an affidavit signed by NYPD Principal Police Communications Technician Yvette Humphries.  Principal Humphries states in this affidavit that she oversees approximately 1200 NYPD radio dispatchers and 911 operators, and testifies in the affidavit as to her knowledge and experience in that position.  (Exh. A ¶ 2).  She states that the dispatchers and 911 operators are "civilian employees of the NYPD."  (Exh. A ¶ 3).  These employees are "responsible for transmitting information from 911 complainants to police officers [and] are not trained to make legal determinations about the existence of reasonable suspicion or probable cause."  (Exh. A ¶ 4).  Moreover, Principal Humphries explains in the affidavit that if a "911 complainant wishes to remain anonymous, radio dispatchers are trained to indicate that anonymity to the responding officers" by referring to the anonymity of the caller in the dispatch.  (Exh. A ¶ 5).

## ARGUMENT

**I.**     **Officers Marte and O'Connor Had Reasonable Suspicion to Stop and Frisk the Defendant Because the 911 Caller was Not Anonymous**

### A.     Applicable Law

In making the reasonable suspicion determination, the relevant inquiry is what was known to the officers at the time of the stop and frisk. See United States v. Colon, 250 F.3d 130, 135-36 (2d Cir. 2001). "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." Id. at 135. However, this doctrine does not permit the knowledge of individuals without "the training, responsibility or authority to make a determination of reasonable suspicion" to contribute to the collective knowledge of the officers who made the Terry stop. Id. at 137.

"Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'" United States v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007) (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)). Whether the tipster was anonymous or not affects the tip's reliability. The Supreme Court has held that "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." Florida v. J.L., 529 U.S. 266, 270 (2000) (citations omitted). It is also true that "[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the

6

absence of special circumstances suggesting that they should not be trusted." Elmore, 482 F.3d at 180.

In United States v. Terry-Crespo, 356 F.3d 1170 (9th Cir. 2004), for instance, the Ninth Circuit rejected the defendant's suppression motion in a case in which a 911 caller provided his full name but not his telephone number or address when reporting that he had been threatened by a man with a gun. Id. at 1172. The Court determined that the 911 call, standing alone, provided the police officers "with the reasonable articulable suspicion" to justify the Terry stop since "as a threshold matter, [the] call was not anonymous and was therefore entitled to greater reliability." Id. at 1174. The Court also considered that – unlike in J.L. – an audio recording of the tip was made, providing evidence of the original call and that the 911 call was "was entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch." Id. at 1176.

In United States v. Colon, 111 F. Supp. 2d 439 (S.D.N.Y. 2000) (LAK), in a determination that was not challenged on appeal, the district court determined that the 911 call on which the officers in the case predicated a Terry stop was not anonymous. In Colon, a woman called 911 and told the operator that she was at a club and a man inside the club had hit her with a gun. Id. 440. She also told the 911 operator that she had already been hit "one time" by the individual in question and that "Officer Alejandro has my report on him." Id. She refused to leave her name and number and stated she would not be at the scene when the officers arrived. Id. Judge Kaplan held that the call was not "truly anonymous" since the caller gave information to police that she believed would lead them to her location and identity. Id. at 442. The Court concluded that had the content of the 911 call been heard by the responding officers, it would

7

have provided reasonable suspicion to stop and frisk the defendant.  Id.  The district court then

held, in the portion of the opinion that was reversed by the Second Circuit, that the 911

operator's knowledge could be imputed to the police officers.  Id. at 443.

       **B.**    **Argument**

       Evidence and testimony at the Hearing established that Officers Marte and

O'Connor specifically recall hearing part of the Dispatcher's transmission in which the

Dispatcher stated:

> Dispute with a firearm.  739 East 182, 739 East 182 Clinton and
> Prospect.  Male caller states male's in front of the location with a
> gun on him.  He didn't visually see the gun, but the person said he
> had one.  Male black, du rag, black coat, wearing all black.  The
> complainant's in apartment [redacted].

       Officer O'Connor remembered hearing the part of the transmission where it was

conveyed that there was a "dispute with a firearm" involving a "male black . . . wearing all black

with firearm" at "Clinton on 182nd." (Tr. 37).  Likewise, Officer Marte remembered hearing

that there was a "male with a gun on the location, male black" (Tr. 18) and that the male was

wearing "all black" (Tr. 11).  Neither officer remembers hearing any other portion of this part of

the dispatch.  This is unsurprising, considering that the officers had not listened to the dispatch in

the over six months since it was made and that each had since received and responded to

thousands of additional radio runs.  (Tr. 9, 32).  Moreover, at the Hearing, the officers

remembered what was likely most important to them on February 20, 2012 – that a black male

fitting a certain description had a firearm at a particular location.  For officer and community

safety reasons, it is not surprising that the officers focused most intently on this information.[3]

---

[3] To the extent Officer O'Connor's memory of what was heard on the night of February 20, 2012
is more complete than Officer Marte's, under the collective knowledge doctrine, Officer

Simply because the officers did not recall the entirety of this part of the radio run, six months after the fact, does not mean they did not hear it on February 20, 2012. Indeed, from their Hearing testimony, this Court should infer that the officers must have heard the entirety of this part of the Dispatcher's transmission, ending with the 911 Caller's apartment number. It is not contested that the officers remember hearing: (1) a dispute with a firearm; (2) at a particular location, Clinton and Prospect; (3) involving a black male with a gun; (4) who was wearing all black, including a black du-rag. Therefore, although they were not able to testify that they remembered hearing the part of the transmission in which the Dispatcher stated "he didn't visually see the gun, but the person said he had one," this portion of the transmission falls between two parts that the officers indisputably did hear. Thus, logic and common sense dictate that this Court may infer that on February 20, 2012, the officers heard that the 911 caller did not visually see the gun, but was told about it.

In addition, the Court may also infer that the officers heard the Dispatcher relay that "[t]he complaintant's in apartment [redacted]." The information about the 911 Caller's location immediately followed the Dispatcher's physical description of the defendant – "[m]ale black, du rag, black coat, wearing all black" – which both officers specifically remembered hearing. Indeed, after the physical description of the defendant, it took the Dispatcher *only two additional seconds* to add the information about the 911 Caller's apartment number. Not only is the location information transmitted a mere two seconds after the physical description of the defendant, but there is no testimony that the officers left their car or were otherwise *unable* to hear the Dispatcher. Given that both officers specifically remember, six months after the

---

O'Connor's knowledge can be imputed to Officer Marte since they were part of the same team of arresting officers. See Colon, 250 F.3d 130, 135.

incident, hearing the information immediately preceding the 911 Caller's apartment number, the Court should infer that they heard the 911 Caller's apartment number as well.  See United States v. Archer, 671 F.3d 149, 167 (2d Cir. 2011) (recognizing that "the district court may draw inferences from context" when considering testimony).

Moreover, circumstantial evidence also strongly suggests that the officers heard the Dispatcher relay the information about the complainant's view of the gun and the 911 Caller's location.  As recounted above, the Dispatcher called the 911 Caller back in order to obtain more information.  (Govt. RR Tr. 2-3).  Approximately one minute and 37 seconds after the Dispatcher relayed the 911 Caller's apartment number to the officers, the 911 Caller told the Dispatcher "I see blue and white" – presumably referred to the officers' marked police car – and then, 20 seconds later, "they're pulling him over now." (Govt. RR. Tr. 2).  This suggests that it took the officers approximately a minute and a half from the end of the Dispatcher's initial transmission for the officers to arrive on the scene.  Thus, after hearing the Dispatcher's initial 20-second transmission, the officers would have been in their police car for a full minute and a half before they arrived at Clinton and Prospect and first encountered the defendant.  The Court should therefore infer that the officers, who were still in their car at the time and not yet in the vicinity of the defendant, heard the entirety of the radio run, including the final two seconds of the Dispatcher's transmission which relayed the 911 Caller's apartment number.

Finally, Principal Yvette Humphries stated in her affidavit that NYPD dispatchers are trained to relay to officers when a 911 caller wishes to remain anonymous.  (Exh. A ¶ 5).  In this case, no such information was relayed to the officers since the 911 Caller in this case was not, in fact, anonymous.  NYPD Officers like Officers Marte and O'Connor, who hear anywhere

from 10 to 70 radio dispatcher *per day* surely know what information is typically relayed in a radio dispatch when a caller providing a tip refuses to provide identifying information.  The Court should use this information to conclude that, in this case, Officers Marte and O'Connor knew that the 911 Caller had provided identifying information when he called 911 and was, therefore, not anonymous.

Thus, it is reasonable for the Court to infer that when Officers Marte and O'Connor stopped the defendant, they knew that the 911 Caller had provided an apartment number where he could be currently located and that this apartment was in the very building where they had been dispatched to respond to the threat of a man with a gun.  The tip in this case was therefore not anonymous.  It was instead a tip "from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." J.L., 529 U.S. at 270. This is particularly true since, even though the officers were not given the 911 Caller's name, they were provided with an apartment number at the scene where they could locate the caller if necessary.  Knowing this before they stopped the defendant, the officers were entitled to have confidence that the 911 Caller was not fabricating the tip he provided to the 911 operator since, had he been lying, he would have been easy to locate and hold responsible for his actions.  In this sense, an exact apartment number at the scene is more valuable than a name or phone number because it allows the officers to locate the tipster quickly and easily.  The 911 Caller in this case, therefore, is even more reliable than the 911 caller in Terry-Crespo, who provided only his name, but not a phone number or address.   The 911 Caller's tip is also more reliable than that in Colon, since in Colon the officers may have been able to locate the 911

caller, who had left the scene, but only with additional research whereas in the instant case the location of the 911 Caller, who was on the scene, was immediately verifiable.

Because the 911 Caller in this case was not anonymous, and because the first portion of the dispatch is attributable to the officers, there was reasonable suspicion to believe that the defendant had a gun such that the officers were entitled to effectuate a <u>Terry</u> stop.  The Court should deny the defendant's motion to suppress the gun on this basis.

## II.    That the 911 Caller May Have Provided Errant Information Does not Affect the Reasonable Suspicion Analysis in this Case

### A.    Applicable Law

It is a well-established principle of criminal law that police officers are entitled to rely on information obtained in good faith.  <u>See</u> <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 908 (1984). In its August 27, 2012 letter to the Court, the Government cited to <u>United States</u> v. <u>Jenkins</u>, 452 F.3d 207 (2d Cir. 2006) for the proposition that "constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts." <u>Id.</u> at 212.  In <u>Jenkins</u>, police officers mistakenly believed that a vehicle they had stopped lacked a license place and was therefore in violation of traffic laws.  The Second Circuit held that this belief, while errant, did not render the stop invalid for Fourth Amendment purposes.  <u>Id.</u> at 212 ("We find no error in the District Court's determination that the initial basis for the stop of the SUV was valid because the officers reasonably believed that the SUV lacked license plates, which would have been a violation of [traffic laws].").

Other Courts have similarly held that a "mistaken premise can furnish grounds for a <u>Terry</u> stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." <u>United States</u> v. <u>Shareef</u>, 100 F.3d  1491, 1505 (10th Cir. 1996) (citations omitted) (internal

quotes omitted); see also United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012) ("Mistakes of law or fact, if objectively reasonable, may still justify a valid stop."). In United States v. Pontoo, 666 F.3d 20, (1st Cir. 2011), officers responded to a 911 call in which the caller stated that he had committed a murder. This prompted officers to arrest and pat down a suspect, during which a gun was found on the suspect. After the suspect had been transported to the police station, the officers learned that the 911 call reporting the murder had been a hoax. Id. at 25. The district court refused to suppress the gun and the First Circuit affirmed, finding that, with respect to the hoax 911 call, "[t]he law does not require officers to determine whether a reported crime actually took place before stopping individuals who may be fleeing the scene." Id. at 29. The Court additionally noted that the officer "took the call seriously" and there was "no reason for him to think" it was a hoax. Id.

**B.    Argument**

When the Dispatcher called the 911 Caller to obtain more information, contrary to what was initially conveyed to the officers, the 911 Caller clarified that the defendant "never told me he had a gun." (Govt. RR. Tr. 2). Neither Officer Marte nor Officer O'Connor were privy to this recantation prior to the stop and frisk of the defendant. Just as in Jenkins and Pontoo, Officers Marte and O'Connor could have learned that the portion of the dispatch was not true only after the Terry stop had occurred. This after-the-fact realization that some of the facts that formed the basis for the officers' reasonable suspicion had been recanted does not affect the validity of the Terry stop.

In Jenkins, as the defendant notes in his brief (Def. Br. 15 n.10), the officers were mistaken about the relevant facts based on their own observations whereas, in the instant case,

the officers were mistaken about the facts because the 911 Caller provided incorrect facts to the 911 operator.  If anything, this counsels in favor of the officers in the instant case, who were entitled to rely on information provided to them by the Dispatcher and had no way of knowing that some of the information that was provided was erroneous.  In contrast, the officers in Jenkins had only their own erroneous observations to blame.  The defendant also attempts to distinguish Jenkins by contending that Jenkins concerned a car stop, in which there is a reduced expectation of privacy.  No matter whether the stop is of a car or a person, however, a Terry stop must be supported by reasonable suspicion.  The Jenkins Court, accordingly, did not rely on the fact that the Terry stop was of a car and not an individual on the street and the defendant's attempt to distinguish Jenkins from the instant case on that basis must be rejected.

The instant case can also be analogized to Pontoo, in which a citizen made a 911 call reporting that he had committed a murder at a certain location.  Officers, the court found, were entitled to rely on this information in making their probable cause determination.  It was of no moment that it was later determined that the caller provided erroneous information since the officers, at the time they responded to the call, were entitled to take the call seriously.  Here, similarly, the officers had no reason to believe that the information relayed by the Dispatcher was anything but true.  Officers Marte and O'Connor did what they were supposed to do and treated the information conveyed to them seriously by responding to the scene, locating the defendant, and patting him down for their safety.

In short, the principles in Leon and Jenkins counsel that Officers Marte and O'Connor were entitled to rely in good faith on the Dispatcher's transmission of the 911 Caller's information in order to make a determination whether a Terry stop was justified in this case.

**III.      This is Not a Case in Which the Harsh Remedy of Suppression Is Appropriate**

The Supreme Court has emphasized that suppression is "'our last resort, not our first impulse'" in dealing with violations of the Fourth Amendment.  Herring v. United States, 555 U.S. 135, 140 (2009) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 144; see also United States v. Clark, 638 F.3d 89, 102 n.12 (2d Cir. 2011) (quoting United States v. Rosa, 626 F.3d 56, 66 (2d Cir. 2010)).

Here, based on the totality of the circumstances in this case, it is plain that Officers Marte and O'Connor did precisely what we want NYPD officers working the midnight patrol shift to do.  That is, they responded quickly to a radio run alerting them to a "dispute with a firearm" in the Bronx.  The officers responded to the location provided, and saw only one person on the block – a person matching exactly the description given by the Dispatcher.  (Tr. 13, 35).  Officer Marte, without drawing his weapon, asked the defendant to accompany him to a safe location so that the defendant could be frisked.  (Tr. 14). To guide him to that location, Officer Marte placed his hand on the defendant's back, where he felt the firearm.  (Tr. 14-15). There is nothing about this scenario that is at all suggestive of any police misconduct.  There are no bad acts here that could possibly be deterred.  Arguably, the only mistake made by either of the officers is not remembering, on August 28, 2012, six months after the incident, all of what they heard on the night of February 20, 2012.  This is not the kind of "mistake" that we need, or want, to deter by deploying the harsh remedy of suppression in this case.

Moreover, it bears mentioning that the Government, in all of its research, was unable to locate a single case in which a 911 caller who provided such complete information to the 911 operator – his full name, address, and phone number – concluded with the suppression of evidence.  It is true that the Dispatcher conveyed over the radio run only a portion of what the 911 Caller told the 911 operator.  Arguably, however, the Dispatcher conveyed the most important information – that the 911 Caller was still on the scene and where he could be located.  Suppression of the gun in this case is therefore not necessary in order to encourage dispatchers to relay additional information to officers, arguably serving only to clog officers' radios with more information than is necessary for them to do their jobs.

## CONCLUSION

For the foregoing reasons, the Government submits that the Court should deny the defendant's motion to suppress the gun in this case.

Dated:      New York, New York
            September 21, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____
    Andrea L. Surratt / Damian Williams
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2493 / 2298

16